# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANGEL GONZALEZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 16 C 2906 |
| | ) |
| CITY OF WAUKEGAN, ADRENE YANCEY, the administrator of the estate of ARTIS YANCEY, deceased, Special Representatives of LUIS MARQUEZ and JOHN MORAN, deceased, and former Waukegan Police Department officer EDWARD DENNIS, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Angel Gonzalez ("Gonzalez") was exonerated by DNA evidence in 2015 after spending 20 years in prison for aggravated sexual assault and aggravated kidnapping. Gonzalez now brings this action against (1) arresting officers John Moran ("Moran") and Edward Dennis

---

[1] This opinion has been unduly lengthened (really needlessly) by the practice of plaintiff's counsel -- unfortunately one of too large a segment of the plaintiffs' lawyers practicing before this District Court -- in drafting the Complaint here as though it were to be filed in the state court a few blocks north -- the Circuit Court of Cook County -- rather than here in federal court. That regrettable tendency stems from the mistaken treatment of a federal complaint as asserting "causes of action" rather than the Fed. R. Civ. P. ("Rule") 8(a) concept of a "claim for relief," so that such a claim for relief is splintered into multiple "counts," each of which is erroneously thought to have a theory of recovery as an essential ingredient. On that score there are two excellent opinions that despite their age (they are approaching their 25th anniversaries) ought to be made compulsory reading for federal practitioners: NAACP v. Am. Family Mut. Ins. Co., 978 F. 2d 287, 292 (7th Cir. 1992) and Bartholet v. Reishauer A.G.(Zurich), 953 F.2d 1073 (7th Cir. 1992). Indeed, counsel's all-too-common error is even harder to understand in light of the Rule 10(b) description of the limited function ascribed to separate "counts."

("Dennis"), (2) interrogating detectives Artis Yancey ("Yancey") and Luis Marquez ("Marquez") and (3) the City of Waukegan (the "City"), which employed all of those individual defendants. Gonzalez asserts federal claims under 42 U.S.C. § 1983 ("Section 1983") for violations of his constitutional rights (a) under the Fourteenth Amendment through unduly suggestive identification techniques, fabrication of evidence, withholding of material exculpatory and impeachment evidence and fabricated confessions, (b) under the Fourteenth and Fifth Amendments for coerced confession and (c) under the Fourteenth and Fourth Amendments for malicious prosecution. Gonzalez also advances state law claims for malicious prosecution, intentional infliction of emotional distress and civil conspiracy.

Now before this Court is defendants' motion to dismiss the First Amended Complaint ("AC") under Rule 12(b)(6) (the "Motion") for failure to state a cognizable claim on the grounds that those claims are (1) inadequately pleaded and (2) are barred by the applicable statutes of limitations. With the Motion now fully briefed, it is ripe for decision.

## **Legal Standards**

Under Rule 12(b)(6) a party may move for dismissal for the "failure to state a claim upon which relief can be granted." Familiar Rule 12(b)(6) principles require the district court to accept as true all of Gonzalez's well-pleaded factual allegations and to view those allegations in the light most reasonably favorable to him as the nonmovant (Lavalais v. Vill. of Melrose Park, 734 F.3d 629, 632 (7th Cir. 2013)). But "legal conclusions or conclusory allegations that merely recite a claim's elements" are not entitled to any presumption of truth (Munson v. Gaetz, 673 F.3d 630, 632 (7th Cir. 2012)).

In the past decade the Supreme Court made an important change in the evaluation of Rule 12(b)(6) motions via what this Court regularly refers to as the "Twombly-Iqbal canon," a

usage drawn from Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), as more finely tuned in Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam) and Ashcroft v. Iqbal, 556 U.S. 662 (2009)). That canon has introduced the concept of "plausibility" into the analysis, and in that respect our Court of Appeals has "interpreted Twombly and Iqbal to require the plaintiff to provid[e] some specific facts to support the legal claims asserted in the complaint" (McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011) (internal quotation marks omitted)). As McCauley, id. went on to reconfirm, claimants "must give enough details about the subject-matter of the case to present a story that holds together."

Because the focus of Rule 12(b)(6) motions is on the pleadings, they "can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice" (Geinosky v. City of Chicago, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). But a nonmovant has more flexibility, for it "may elaborate on [its] factual allegations so long as the new elaborations are consistent with the pleadings" (id.).

## **Factual Background**[2]

Gonzalez was convicted of aggravated sexual assault and aggravated kidnapping back in 1995 (AC ¶ 2). Gonzalez then spent 20 years in prison on those convictions until his innocence was conclusively demonstrated by DNA evidence in 2015 (AC ¶¶ 5, 6). Consequently Gonzalez filed for and received a Certificate of Innocence in June 2015 (AC ¶ 7).

---

[2] What follows is a summary of Gonzalez's allegations, accepted as true for present purposes (Christensen v. County of Boone, 483 F.3d 454, 466 (7th Cir. 2007) (per curiam). All citations to the First Amended Complaint will simply take the form "AC ¶ --."

On June 10, 1994 Jane Doe[3] was taken from her apartment building by two assailants, driven a short distance away and raped (AC ¶ 22). Dazed and disoriented, she then wandered the streets until she reached a 7-11 convenience store and used the phone there to call the police (AC ¶ 22).

Officer Moran and another officer arrived at the 7-11 a short time later to interview Jane Doe (AC ¶ 24). She gave the officers a description of her attackers that did not match Gonzalez in many respects (AC ¶ 25). Moran and the other officer then drove Jane Doe to her apartment, where Lieutenant Dennis and Jane Doe's boyfriend were waiting (AC ¶ 24). As the boyfriend was being notified of the crime by the officers, he noticed a black sedan pulling out of the parking lot and brought it to the attention of the officers, noting that he did not recognize it (AC ¶ 26).

Gonzalez, who was driving his girlfriend home after they had spent the evening with her sister (a resident in Jane Doe's apartment building), was the person driving the sedan (AC ¶¶ 26, 28). When the other officer at the scene noted Gonzalez's license plate, he relayed it to Dennis (AC ¶ 29), who left the apartment building to patrol for the black sedan (AC ¶ 30).

Gonzalez dropped his girlfriend off at her home and was driving to his own home when Dennis saw his car and stopped him, coincidentally outside the Lake County Jail (AC ¶ 30). Dennis radioed Moran, who was still with Jane Doe, and asked him to bring Jane Doe to the scene to identify Gonzalez as her attacker (AC ¶¶ 32, 33). Instead of performing a lineup procedure at the jail, Dennis performed a "showup identification" on the street (AC ¶ 33).

---

[3] Name changed to protect the victim's identity.

Moran told Jane Doe that they had found a person who matched her description of her attacker and his car (AC ¶ 34). Moran drove her to the street location where Dennis had apprehended Gonzalez, telling her that the police had located a vehicle and driver who matched her description (AC ¶ 34). Dennis placed Gonzalez in handcuffs and brought him to the front of Moran's car, where he was illuminated by the headlights (AC ¶ 35). Jane Doe, who was in the back of Moran's car and out of sight of Gonzalez, told the officers that Gonzalez was one of her attackers (AC ¶ 36).

Dennis then took Gonzalez to the Waukegan Police Department and booked him (AC ¶ 38). Gonzalez was kept in a holding cell with no bed, food or water. Gonzalez spoke almost no English at the time and did not understand the events unfolding or the reasons behind them (AC ¶¶ 27, 38, 39) -- in particular, he did not understand why he had been arrested (AC ¶ 39). He was not allowed to make any phone calls at any time (id.).

After a sleepless night for Gonzalez, Detective Yancey took him to an interview room at the police department and began a seven-hour interrogation (AC ¶¶ 39, 41). When the interrogation began, Yancey and Detective Marquez knew that Gonzalez did not match the initial description of the attacker and that the only evidence against Gonzalez was the showup identification (AC ¶ 43). Although Gonzalez did not understand or speak English, Yancey explained his Miranda rights in English (!) and had Gonzalez sign an English waiver (!) of those rights (AC ¶ 42). Yancey then proceeded to interrogate Gonzalez in English (!) (AC ¶¶ 41, 42). Gonzalez later asked for an attorney multiple times, but the detectives ignored his requests (AC ¶ 47). Marquez then took over the interrogation, speaking in Spanish (AC ¶ 44).

Gonzalez insisted that he had no knowledge of the crime and that he had been with his girlfriend and her sister when the crime occurred (AC ¶¶ 45, 50). Yancey and Marquez refused

- 5 -

to accept that story, pressing Gonzalez to write out a confession (AC ¶ 51). They told Gonzalez that if his story was true, the judge would let him go in spite of a confession (AC ¶ 51).

During the interrogation Yancey and Marquez told Gonzalez details about the crime gleaned from police reports and continued to press him for a confession (AC ¶ 52). They told him the interrogation would continue until he confessed (AC ¶ 54). Hungry, thirsty and tired, Gonzalez eventually agreed to write a confession (AC ¶ 54). Not satisfied with the low level of detail in that confession, Yancey and Marquez tore it up and had Gonzalez write a more detailed statement (AC ¶¶ 55, 56). When that statement again proved to have no significant details matching Jane Doe's description of the crime (AC ¶ 57), Yancey and Marquez typed out a confession in English (!) for Gonzalez to sign (AC ¶ 58), even though he was unable to read it (AC ¶ 59). That statement written by Marquez and Yancey contained many details about the crime that the police had learned from Jane Doe and from investigations of the scene (AC ¶ 58). Yancey and Marquez then turned on the interview room's cameras for the first time, and they read the statement aloud rather than letting Gonzalez use his own words (AC ¶¶ 64, 65).

Yancey, Marquez, and Dennis all represented to the prosecution that the evidence they had obtained was free of coercion and undue suggestion (AC ¶ 68). As there was no physical evidence linking Gonzalez to the crime (AC ¶ 3), Jane Doe's identification of Gonzalez and Gonzalez's confession were the only pieces of evidence used in Gonzalez's trial (AC ¶ 74).

As stated at the outset, Yancey, Marquez, Dennis and Moran were employees of the City at all relevant times (AC ¶¶ 16, 18, 19, 20). It was the City's de facto policy, pattern and practice to countenance its police's fabrication of evidence, coercion of suspects' statements and suppression of exculpatory evidence (AC ¶ 85). All four individual defendants -- Yancey,

Marquez, Dennis and Moran -- acted pursuant to those de facto policies, patterns and practices when they investigated Gonzalez (AC ¶ 84).

**Gonzalez's Claims for Relief**

**Federal Claims**

Count I: Unduly Suggestive Identification Procedures

Under the Sixth Amendment to the Constitution, made applicable to state court criminal defendants via the Fourteenth Amendment, every such defendant is guaranteed the right to a fair trial, and "that right is violated if unduly suggestive identification techniques are allowed to taint the trial" (Alexander v. City of South Bend, 433 F.3d 550, 555 (7th Cir. 2006)). To state a claim for unduly suggestive identification techniques, a plaintiff must allege (1) that the technique used was suggestive and (2) that such suggestiveness was unnecessary (United States v. Hawkins, 499 F.3d 703, 707 (7th Cir. 2007)). Once a plaintiff has shown a technique to be unduly suggestive, the court must then determine whether the technique was nevertheless reliable under the totality of the circumstances (id.). Our Court of Appeals has held that showup identifications are inherently suggestive (id.), but the admission of showup evidence, without more, does not violate due process (id.).

Foster v. California, 394 U.S. 440, 443 (1969) teaches that if a procedure is structured so that the victim's identification of a certain defendant is "all but inevitable," the reliability of the identification is so undermined that due process is violated -- in other words, the procedure would be found unduly suggestive. There are circumstances, however, in which a suggestive showup identification is nonetheless justified -- for instance, in cases of extraordinary urgency (Hawkins, 499 F.3d at 707). To determine whether a showup identification was unnecessarily

suggestive under the entirety of the circumstances, the court must determine that the agent had good reason for failure to pursue a less suggestive alternative (id.).

When credited, as they must be for Rule 12(b)(6) purposes, the allegations in this case establish an unduly suggestive showup, the results of which were used in court proceedings that deprived Gonzalez of his liberty for 20 years. Once again, Dennis pulled Gonzalez over based solely on the fact that the victim's boyfriend had mentioned that his car looked "unfamiliar" in their apartment complex (AC ¶ 26). Gonzalez did not match the physical description Jane Doe had given police in several respects (AC ¶ 25). Nevertheless Moran brought the victim to the location where Dennis had pulled Gonzalez over (AC ¶ 32). When Jane Doe arrived she saw Gonzalez in handcuffs in front of Moran's car (AC ¶ 35). Jane Doe did not get out of the car to look at Gonzalez -- instead she identified him from the back seat (AC ¶ 36). Moran then told her (falsely) that Gonzalez and his car matched her description, and he then asked her to identify Gonzalez as her attacker (AC ¶ 34, 36). Any case that police officers might seek to make for the urgency of those procedures is called into serious question by the fact that the showup was conducted across from the Lake County Jail, a facility with lineup facilities (AC ¶ 33). This case presents a set of facts that -- if proved -- would show that the <u>officers</u> actually identified Gonzalez for the victim (rather than the other way around) under suggestive circumstances without adequate justification.[4]

_____
[4] Defendants mischaracterize those events in both the Motion and the defendants' Reply. Instead of acknowledging that the AC alleges that Moran told Jane Doe she was on the way to identify a man and car that matched her description (AC ¶ 34), defendants reframe the allegation as stating that Moran was <u>in fact</u> taking her to a man and car that matched her description (see Motion at 9; D. Reply at 4). It is more than irresponsible for defendants to alter the AC in that way: Both the AC itself and the Plaintiff's Response make it clear that Jane Doe's description of
(continued)

Gonzalez unquestionably presents factual allegations sufficient to support his Section 1983 claim for unduly suggestive techniques. Accordingly defendants' motion to dismiss Count I on that basis is denied.

Count I: Withholding of Evidence (Brady)

To prevail on a civil Brady claim, the plaintiff must show (1) that the evidence was favorable to him, (2) that it was concealed by the officer and (3) that the concealed evidence resulted in prejudice at the plaintiff's criminal trial (Cairel v. Alderden, 821 F.3d 823, 832 (7th Cir. 2016)). As Cairel, id. said:

> A corollary of the prosecution's duty to disclose to the defense is that the police must disclose exculpatory evidence to the prosecutors.

To prove prejudice a plaintiff must show "that the failure to disclose caused a deprivation of the accused's liberty" (id.).

As to the showup procedure, Gonzalez alleges facts satisfying all three of these requirements. Moran and Dennis concealed from Gonzalez and the prosecution the fact that they fed details about the suspect and the vehicle to Jane Doe before she made her identification (AC ¶ 37). They misrepresented the circumstances of Jane Doe's identification of Gonzalez in their written and oral reports to prosecutors and in their testimony at trial by falsely reporting that the identification was free of suggestion and that the details about Gonzalez and his car had originated from the victim, rather than from the defendant officers themselves (id.). Gonzalez was of course present at the showup identification, but he was unable to hear Moran and Dennis passing that information to the victim or to know the actual circumstances that produced the

---

(footnote continued)
her attacker did not match Gonzalez's appearance (AC ¶ 25; P. Resp. at 3 n.3, pointing out that the AC never alleges that Jane Doe described her attacker's car).

identification (AC ¶¶ 35-36).  Jane Doe's identification was then used against Gonzalez at trial (AC ¶ 74).  Because the prosecutor used only one other piece of evidence against Gonzalez at his trial, disclosure of the circumstances surrounding Jane Doe's identification could well have led to a different outcome at his trial (AC ¶¶ 74-76).

Once again Gonzalez's factual allegations pass muster, this time sufficiently to state a Brady claim against Moran's and Dennis's conduct involving the showup identification.  So defendants' Motion to dismiss Count I on that basis is denied as well.

Counts I and II:  Fabrication of Evidence

Whitlock v. Brueggmann, 682 F.3d 567, 580 (7th Cir. 2012) makes clear that "a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way."[5]  In this instance Gonzalez's fabrication of evidence claim rests on the allegation that Moran and Dennis fed information about Gonzalez and his vehicle to Jane Doe before her identification and then included the regurgitated details in their reports to prosecutors, the court, the defense and the jury (AC ¶ 96).

---

[5] Defendants cite Petty v. City of Chicago, 754 F.3d 416, 422 (7th Cir. 2014) for the proposition that defendants needed to know that Gonzalez was innocent to have fabricated evidence against him (Motion at 12). That proposition is nonsensical and a gross mischaracterization of Petty's holding, which states that defendants need know only that the evidence itself was false in order to be guilty of fabricating evidence (754 F.3d at 423), something Gonzalez properly alleges.

Even worse, defense counsel flout Rule 11(b)(2) by asserting that there is no federal claim for fabrication of evidence, even while citing several Seventh Circuit cases that have explicitly allowed for a fabrication of evidence claim (e.g., Saunders-El v. Rohde, 778 F.3d 556, 559-60 (7th Cir. 2015); Fields v. Wharrie, 740 F.3d 1107, 1114 (7th Cir. 2014); Whitlock, 682 F.3d at 580) (Motion at 13-15).  As defendants have thus undermined their own argument, this Court need not address the point further.

If Gonzalez's allegations are accurate, as they must be considered on the current Motion, the defendant police officers' report contained fabricated evidence. It can also be reasonably inferred that the police report detailing Jane Doe's identification, as a central part of the original case against Gonzalez (AC ¶ 74), was instrumental in Gonzalez's conviction and subsequent incarceration. Hence defendants' Motion to dismiss Count I on that basis is denied.

In the same vein, Gonzalez alleges that Yancey and Marquez fed him details about the crime, had him repeat those details and then used those details in a confession that Yancey and Marquez typed out (AC ¶ 58). As said earlier, Gonzalez has been definitively shown to be totally innocent of kidnapping and raping the victim (AC ¶¶ 80-83). Whatever other fanciful explanation might be dreamed up for the inclusion of details about the crime in Gonzalez's confession, the only plausible real world explanation for such inclusion must be either intentional additions by defendants or the regurgitation of facts they fed to Gonzalez. And once again it is more than merely plausible that the confession -- as one of the two pieces of evidence used at Gonzalez's trial (AC ¶ 74) -- could certainly have been a proximate cause of his conviction. So defendants' Motion to dismiss Count II on that basis is denied as well.

With that line of attack on Count II scotched, a possible alternative aspect of that count bears mention. Although Gonzalez does not explicitly allege a <u>Brady</u> claim against Yancey and Marquez in Count II for concealing the circumstances of the interrogation from the prosecution, and although plaintiff's Response does not address a possible <u>Brady</u> claim on that ground, defendants point out that AC ¶ 66 could nevertheless be read to assert such a claim.

In that respect defendants argue that the circumstances of Gonzalez's interrogation were always available to Gonzalez himself, negating the prospect of a <u>Brady</u>-based claim (see <u>Gauger v. Hendle</u>, 349 F.3d 354, 360 (7th Cir. 2003), overruled in part on other grounds by <u>Wallace v.</u>

City of Chicago, 440 F.3d 421, 427 (7th Cir. 2006)). This Court agrees. So although Count II as such survives possible dismissal, it cannot be employed as the predicate for such a claim.

Count III: Coerced Confession

In the seminal decision in Brown v. Mississippi, 297 U.S. 278, 286-87 (1936) it was established that introducing an involuntary confession into evidence in a criminal trial violates the accused's due process rights. And of course the Fifth Amendment guarantees the right to remain silent unless an accused chooses to speak (Miranda v. Arizona, 384 U.S. 436, 460 (1966)). Hence to be lawfully admitted into evidence a defendant's statement must "be the product of free and rational choice" -- that is, it must be voluntary (Greenwald v. Wisconsin, 390 U.S. 519, 521 (1968) (per curiam)). In turn, voluntariness requires that a confession must not be extracted by coercion -- a defendant's will must not have been "overborne" during the course of his interrogation (Reck v. Pate, 367 U.S. 433, 440 (1961)). And of course "coercion can be mental as well as physical" (Blackburn v. Alabama, 361 U.S. 199, 206 (1960)).

Here Gonzalez has provided abundant details as to his interrogation, including allegations that he was denied an attorney (AC ¶ 47), deprived of food and water (AC ¶¶ 39, 48), required to sign a Miranda waiver in English that he could not understand (AC ¶ 41), interrogated at first in English (AC ¶ 41) and told that the interrogation would continue until he confessed (AC ¶ 49).

As for his treatment at the Waukegan Police Department, Gonzalez alleges facts almost identical to those held to be involuntary and inadmissible in Greenwald, 390 at 521 (numerous internal citations omitted):

> All of the above recited facts are, under our decisions, relevant to the claim that the statements were involuntary: the lack of counsel, especially in view of the accused's statement that he desires counsel; the lack of food, sleep, and medication; the lack or inadequacy of warnings as to constitutional rights.

> Considering the totality of these circumstances, we do not think it credible that petitioner's statements were the product of his free and rational choice.

Those appalling violations and more are mirrored in AC ¶¶ 41, 42, 46 and 48. Moreover, even though Gonzalez maintained his innocence, the officers told him he could not leave until he confessed (AC ¶ 51, 53). And all of those ingredients of involuntariness are aggravated by the fact that the officers did not record his interrogation on video (AC ¶ 63) although they had the capabilities to do so. And to heap Pelion upon Ossa, at the <u>end</u> of the interrogation the officers did turn on the video camera and Gonzalez was ultimately required to read a confession written by the officers (AC ¶ 64).

It is really an understatement to hold simply that Count III also withstands defendants' challenge in substantive terms.[6] Indeed, the entire analysis to this point calls into serious question defense counsel's performance in Rule 11(b) terms. Just as the justice system is entitled to demand more from law enforcement officers than the deeply troubling allegations here portray, so too the justice system is entitled to demand more from lawyers than the assertion of groundless positions that necessitate the kind of extensive negating exposition set out in this opinion.

That criticism does not necessarily extend to defendants' assertion of the affirmative defense that Gonzalez's coerced confession and coercive interrogation claims are arguably time barred on the premise that the limitations clock began to tick either at the time of his

---

[6] Count III is titled "42 U.S.C. § 1983 Violation of the Fifth and Fourteenth Amendments, Coerced Confessions." Although that label is accurate in the fundamental sense that whatever Bill of Rights guaranties are made applicable to the states are made operative through the Fourteenth Amendment, Gonzalez's Response has confirmed that he does not allege a stand alone Fourteenth Amendment claim for any asserted violation of substantive due process.

interrogation or at the time of trial. In that respect Section 1983 claims look to the relevant state limitations period for personal-injury torts (Wallace v. Kato, 549 U.S. 384, 387 (2007)) -- here in Illinois, two years (735 ILCS 5/13-202).

But here too defense counsel fall short, for they have paid no heed to the teaching in Heck v. Humphrey, 512 U.S. 477, 486-87 (1994) that a plaintiff cannot bring civil claims that would call into question the integrity of a conviction or sentence until the conviction or sentence is vacated. If Gonzalez had attempted to bring a Section 1983 claim challenging his coerced confession within two years after that confession -- a period during which he was serving time for his conviction -- the Heck principle would have precluded him from doing so. So the statute of limitations for Gonzalez's coerced confession claim did not begin to run until his conviction was vacated on March 9, 2016 (Heck at 489).

In an effort to get around Heck, defendants essentially argue that Gonzalez could have brought his coerced confession claim earlier because his success on that claim would not have called into question the validity of his conviction, on the theory that the conviction might have rested on Jane Doe's identification of Gonzalez alone But such a contention essentially seeks a holding by this Court that police officers can limit their liability for unconstitutional actions that lead to wrongful convictions by performing additional unconstitutional actions that create different points of accrual for the statute of limitations. This Court declines that invitation, and its denial of defendants' Motion to dismiss Count III remains intact.

Count IV: Federal Section 1983 Malicious Prosecution Claim

Unlike several other Courts of Appeals, our own has held that a plaintiff cannot bring a malicious prosecution claim under Section 1983 if a state malicious prosecution claim would provide an adequate remedy (it has continued to adhere to that proposition, first set out in

- 14 -

Newsome v. McCabe, 256 F.3d 747, 751 (7th Cir. 2001)). Because Illinois law allows for a malicious prosecution claim, which on that premise would provide an adequate remedy (id.), this Court's duty to adhere to the Newsome doctrine would call for the dismissal of Count IV.

But at this moment the Supreme Court, having recently granted certiorari on that very issue in Manuel v. City of Joliet, 136 S.Ct. 890 (2016), has heard oral arguments in that case on October 5, 2016. Gonzalez has understandably asked that this Court delay ruling on his Section 1983 malicious prosecution claim until after the Supreme Court decides Manuel, and this Court grants his request.

**State Law Claims**

Count VI: Malicious Prosecution

At the outset it might be wondered why the just-completed discussion of Count IV has any relevance, given the AC's inclusion of a state law count presenting the same substantive claim. Although this Court does not fancy itself to be a mindreader, one obvious factor for such consideration is the existence of 42 U.S.C. § 1988, which rewards a successful Section 1983 claim with an award of attorney's fees, while no such remedy applies to a like state law claim under the so-called "American rule." This Court is also mindful of the consideration that if the Supreme Court were to reject the Newsome reasoning, a Section 1983 claim sounding in malicious prosecution would likely draw from the same analytical well as a state common law claim. So this opinion will go on to treat with Count VI.

To state a claim for malicious prosecution under Illinois law a plaintiff must allege (Hurlbert v. Charles, 238 Ill.2d 248, 255, 938 N.E.2d 507, 512 (2010)):

> (1) the defendant commenced or continued an original criminal or civil judicial proceeding; (2) the proceeding terminated in favor of the plaintiff; (3) there was

an absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.

Gonzalez's allegations indisputably comport with all of those elements except the fourth, so this opinion needs to deal only with that fourth requirement.

In that respect defendants urge that probable cause existed at the time of Gonzalez's arrest and that no other facts are alleged that would show malice on the part of defendants. As for their probable cause assertion, they seek to rest it on the showup identification procedure that was employed in Gonzalez's case. But on that score this opinion has earlier upheld the legal sufficiency of the AC's challenge to that procedure as unduly suggestive. With a viable claim of the absence of probable cause added to the mix, defendants' Motion to dismiss Count VI also must be and is denied.

Count VII: Intentional Infliction of Emotional Distress

Under Illinois law the tort of intentional infliction of emotional distress carries a one-year statute of limitations (745 ILCS 10/8-101). Defendants advance limitations as an affirmative defense to any such claim by Gonzalez, citing Bridewell v. Eberle, 730 F.3d 672, 678 (7th Cir. 2013) in support. Bridewell, id. teaches that a claim for intentional infliction of emotional distress accrues at the time of the injury and is not extended indefinitely if the injuring party does not remedy the distress.

But once more defendants have failed to appreciate the principles embodied in the Heck case, which Lieberman v. Liberty Healthcare Corp., 408 Ill. App. 3d 1102, 1111, 948 N.E.2d 1100, 1107 (4th Dist. 2011) has extended to Illinois state law torts. Their effort to call Bridewell to their aid cannot succeed because that decision had no occasion to consider the impact of Lieberman and Heck, for in Bridewell the plaintiff was held lawfully on an auxiliary charge --

- 16 -

she was never convicted of the murder charge that related to her intentional-infliction-based claim (see 740 F.3d at 678). By sharp contrast, here Gonzalez alleges that the combined conditions of his interrogation eventuated in the coerced confession that resulted in his wrongful conviction, all of which combined to constitute the intentional infliction of emotional distress claim in that regard.

That being so, a successful claim of the type asserted in Count VII would necessarily call into question the validity of Gonzalez's conviction, and the Heck principle controls the limitations issue. And that means the one-year statute of limitations did not begin to run until Gonzalez's conviction was overturned in March of this year.

In the alternative defendants contend that none of the allegations would satisfy the "extreme and outrageous" element of the tort, which requires "conduct that goes beyond all possible bounds of decency, such that a reasonable person would hear the facts and be compelled to feelings of resentment and outrage" (Duffy v. Orlan Brook Condo. Owners Ass'n, 2012 IL App (1st) 113577 ¶ 36, 981 N.E.2d 1069, 1079 (2012)). Although this Court hopes that defense counsel's sensibilities have not been blunted by being called on to defend against such charges of the egregious abuse of police power as those lodged by Gonzalez here (if for no other reason than that experience teaches that advocacy on both sides of the "v." sign tends to be better served and more persuasive if an advocate can maintain and observe a balanced view of the strengths as well as the weaknesses of an opposing advocate's position), from this Court's perspective as a nonadvocate it holds that Gonzalez's allegations, rooted as they are in a gross abuse of power by officers of the law, could readily compel feelings of resentment and outrage in a reasonable person. In sum, defendants' Motion to dismiss Count VII fails as well.

**Counts V, VIII, IX and X:   Monell, Civil Conspiracy, Respondeat Superior and Indemnification Claims**

Finally, defendants argue (1) that the Monell and civil conspiracy claims should be dismissed if there is no underlying claim and (2) that the respondeat superior and statutory indemnification claims against the City should be dismissed if the City's employees are not liable. This opinion has held that Gonzalez has alleged facts sufficient to sustain all of his underlying claims save his Section 1983 malicious prosecution claim, which remains to be revisited after the Supreme Court makes its decision in Manuel. Hence defendants' Motion to dismiss Counts V, VIII, IV and X is denied.

## Conclusion

Defendants' Motion is denied in all respects save as to AC Count IV, as to which decision is deferred. Defendants are ordered to file an answer to all counts except Count IV on or before December 23, 2016, and a status hearing is set for 9 a.m. December 30, 2016 unless any counsel will be unavailable at that time. In that event counsel should confer among themselves and advise this Court's courtroom deputy as to the earliest date of their joint availability, and this Court will reschedule the status hearing.

_____
Milton I. Shadur
Senior United States District Judge

Date:  December 6, 2016